1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   REGINALD JACKSON,

11          Petitioner,            No. CIV S-06-1256 GEB CHS P

12      vs.

13   THOMAS L. CAREY, Warden, et al.,

14          Respondents.         FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.      INTRODUCTION

17          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges former California Governor Gray

19   Davis's reversal of the October 23, 2002 decision by the Board of Parole Hearings (hereinafter

20   Board) finding petitioner suitable for parole.  Petitioner claims that the Governor's action

21   violated his right to due process.  Upon careful consideration of the record and the applicable

22   law, the undersigned will recommend that petitioner's petition for habeas corpus relief be

23   granted.

24   II.     PROCEDURAL AND FACTUAL BACKGROUND

25      A.      Commitment Offense

26          In 1982, petitioner pled guilty to second degree murder.  (Answer, Ex. A. at 2.)

1

On May 20, 1982, he was sentenced in the Los Angeles County Superior Court to fifteen years to life in state prison.  (Id.)  Petitioner entered the California Department of Corrections on May 28, 1982 to begin serving his sentence and became eligible for release on parole on July 24, 1990. Answer, Ex. D. at 4).

The circumstances of petitioner's commitment offense were described at his October 23, 2002 parole suitability hearing, as follows:

> PRESIDING COMMISSIONER ANGELE: Mr. Jackson, you were involved in a shooting that took the life of one Frederick Jenkins; is that true?
>
> INMATE JACKSON: Yes.
>
> PRESIDING COMMISSIONER ANGELE: You know, I read the report, did it ever establish whose gun the bullet came from?
>
> INMATE JACKSON: Not that I'm aware of.  I'm not sure.
>
> PRESIDING COMMISSIONER ANGELE: Mr. Sousa, do you know that?
>
> DEPUTY DISTRICT ATTORNEY SOUSA: I do not.
>
> PRESIDING COMMISSIONER ANGELE: I couldn't find it in all of mine.  Now apparently there was a number of you that had guns.
>
> INMATE JACKSON: Yes.
>
> PRESIDING COMMISSIONER ANGELE:   And it was an altercation, I recall, that wound up actually splitting up.  They left, the rival gang members left, and then came back.  Is that what happened?
>
> INMATE JACKSON: No.
>
> DEPUTY DISTRICT ATTORNEY SOUSA: I believe it was the other way around.  The inmate and his gang members left after the initial fight and came back with firearms.
>
> PRESIDING COMMISSIONER ANGELE: Okay.
>
> INMATE JACKSON: Excuse me, Sir.  I'm not aware of an initial fight.  But there was a fight that took place at the time that I was at the school just before the shooting started.  Anything prior to that, I don't know about.  I'm not aware of.

2

1   PRESIDING COMMISSIONER ANGELE: What was the other
2   gang?  Do you remember what they were?

3   INMATE JACKSON: They were called the (indiscernible) Crips.

4   PRESIDING COMMISSIONER ANGELE: And you guys were
    Bloods?

5   INMATE JACKSON: No, Crips.

6   PRESIDING COMMISSIONER ANGELE: Another part of the
7   Crips?

8   INMATE JACKSON: Yes.

9   PRESIDING COMMISSIONER ANGELE: Why did you get
    involved in this in the first place?

10  INMATE JACKSON: Excuse me?

11  PRESIDING COMMISSIONER ANGELE: Why were you
12  involved in this in the first place.  Did some of your gang members
    come and want to get some help?

13  INMATE JACKSON: No, I'm not sure - - clear about what you're
14  asking me.

    PRESIDING COMMISSIONER ANGELE: Why were you
15  involved in the first place in the shooting?

16  INMATE JACKSON: Actually, after this fight happened at the
    school, which took place right next to me, some shooting started
17  right after the fight started.  And after the shooting started, I started
    shooting as well because I was young and at a location where
18  everything was taking place.  I participated in the shooting once
    everything began.  Did I answer you?
19
    PRESIDING COMMISSIONER ANGELE: Yes.
20
    INMATE JACKSON: Excuse me, at the school, there was a
21  function that night.  It was a homecoming celebration or something
    like that.  We were waiting outside the boys' gym area.  Waiting to
22  get inside the gym where the celebration was going to be held
    before all of this took place.  The fight started and then the
23  shooting.

24  PRESIDING COMMISSIONER ANGELE: What happened - -
    Where did your gun wind up at?  Your gun?
25
    INMATE JACKSON: In terms of what?
26

3

PRESIDING COMMISSIONER ANGELE: What did you do with it?

INMATE JACKSON: Once I got finished with it, I thought I threw it away, but I didn't.  And I don't know how it came up later, but I did get rid of it myself.

PRESIDING COMMISSIONER ANGELE: The report said a lot of guys went to Payton's (phonetic) apartment and left their guns there.

INMATE JACKSON: No, Sir.  After the shooting happened at the school, everybody went home I thought.

PRESIDING COMMISSIONER ANGELE: Okay, well this indicates that they went to Payton's apartment.  Some of them left their guns there - - I'm sorry, to get their guns there - - I'm sorry, to get their guns.  I'm not - - Tell you what, I'm going to recess.

DEPUTY DISTRICT ATTORNEY SOUSA: Okay.

PRESIDING COMMISSIONER ANGELE: I need to (inaudible).

[Off the record]

DEPUTY COMMISSIONER CASSADY: We're back on record.

PRESIDING COMMISSIONER ANGELE:  Thank you.  All right, the question I'd asked you is how did you get involved.  There was an altercation?

INMATE JACKSON: Yes.

PRESIDING COMMISSIONER ANGELE: At the school.

INMATE JACKSON: Yes, sir.

PRESIDING COMMISSIONER ANGELE: It indicates that they went to somebody's house and retrieved their gun.  This would be your homeboys.  How did you get involved in this situation at that point?

INMATE JACKSON: Well, we had already planned to meet up at the school and go to the celebration.

PRESIDING COMMISSIONER ANGELE: Right.  Okay.

INMATE JACKSON: And at that point when I got to the school, I think I went with maybe two or three people.  And some other guys met us there.  We didn't meet up prior to coming to the school.  Most of us met up at that point.  And when we went - -

4

when we got there, I already had a weapon on me.  And I think a couple of other guys did, too.  Maybe two or three if I'm not mistaken.  It's not that we met up anywhere to go get guns.  I came there with one.

PRESIDING COMMISSIONER ANGELE: Yeah, but the report does indicate that someone apparently went to Payton's apartment where they had left their guns to retrieve them apparently.

INMATE JACKSON: That could be true.  But as far as my - - as far as my involvement, I met some of these guys at the school.

PRESIDING COMMISSIONER ANGELE: Okay.  You and a couple of guys stayed at the school.

INMATE JACKSON: Yes.

PRESIDING COMMISSIONER ANGELE:  Okay.

INMATE JACKSON: No, we met up at the school.  It's not that they left and left us there, we all - - at some point we decided at a certain time we would meet up there.

PRESIDING COMMISSIONER ANGELE: Okay.  I want to make sure I got this right.  I'm looking at the probation officer's report. It says they went to Payton's apartment and some of them then left there to get guns while Foster and two others stayed.  Do you recall that?

INMATE JACKSON: I'm not denying it either.  I don't know if it's true on their part.  I can't deny it.

PRESIDING COMMISSIONER ANGELE: You remained at school?

INMATE JACKSON: Yeah.  No, I never - - No one left me at the school.  When I got there, I met up with them there.  I came there.

PRESIDING COMMISSIONER ANGELE: You stayed there?  At the school?

INMATE JACKSON: No.  You mean in terms of me staying there and them leaving to get weapons?

PRESIDING COMMISSIONER ANGELE: No, just you going there and not leaving.

INMATE JACKSON: Right, yes, exactly.

PRESIDING COMMISSIONER ANGELE: Okay.  Now apparently - - Okay, Foster was one of your homeboys?

INMATE JACKSON: Yes.

PRESIDING COMMISSIONER ANGELE: And Jenkins was the one that started the fight?

INMATE JACKSON: Yes.

PRESIDING COMMISSIONER ANGELE: And then I guess both groups started shooting at each other?

INMATE JACKSON: Yes, the fight started first, yes.

PRESIDING COMMISSIONER ANGELE: How do you feel about Mr. Jenkins being killed?

INMATE JACKSON: I feel bad about Jenkins getting killed.  I actually knew him.

PRESIDING COMMISSIONER ANGELE: You did know him?

INMATE JACKSON: Yes.

PRESIDING COMMISSIONER ANGELE: You were 19 at the time?

INMATE JACKSON: Yes, Sir.

/////

(Answer, Ex. D. at 9-16.)

    B.    Parole Board Hearing

        At petitioner's October 23, 2002, parole consideration hearing the Board found petitioner suitable for parole.  (Id. at 49)   The Board concluded that petitioner "would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison" because : (1) petitioner enhanced his ability to function within the law as a result of education, self-help, therapy and vocational programs, through which he earned an AA degree, a BA degree and completed training in shoe repair, automotive repair and optical lens crafting; (2) he lacked a significant criminal history of violent crime, having only been convicted of crime twice in his lifetime; (3) he had a reduced probability of recidivism as a result of maturation, growth, greater understanding and advancing age; (4) he had maintained positive behavior while institutionalized, receiving only one 115 during his total incarceration; (5) he maintained close

6

1   family ties while in prison; (6) he had realistic parole plans which included a job opportunity and

2   housing; (7) he showed signs of remorse and understanding; (8) his psychological reports were

3   supportive and included a finding that he "became the benchmark for developing a legitimate

4   understanding of remorse in 1996."; and (9) he committed his crime while under stress.  (Id. at

5   49-53.)  Presiding Commissioner Angele closed the hearing by telling petitioner that "nothing

6   was going to change the crime no matter how long you stay in prison, the quality of your life

7   since you've been in prison, to me, is exemplary."   (Id. at 55.)

8         C.      Governor's Reversal of Parole Grant

9               On March 21, 2003, then-Governor Gray Davis found petitioner unsuitable for

10  parole and reversed the Board's October 23, 2002 decision.  (Petition at 49.)  In his decision, the

11  former Governor disagreed with many of the findings and conclusions expressed in the Board's

12  decision, and made his own findings from the record.  (Id. at 49-53.)  The Governor found that

13  petitioner would pose "an unreasonable danger to society at this time."  Id. at 53.  The Governor

14  explained his reasoning as follows:

15              During his incarceration, Mr. Jackson has made commendable
                gains.  He earned an A.A. degree from Hartnell College in 1987
16              and a B.A. in Social Science from San Jose State University in
                June 1991.  He also attended accounting courses through Valley
17              Adult School.  In 1997, he completed vocational program in
                optical technology.  He then passed the American Board of
18              Opticians test, reportedly with one of the highest scores, and held
                an optician certification from 1998 to 2001.  During his
19              incarceration he has held several jobs, including optical technician,
                barber, porter, gardener, and tool room aide.  Notwithstanding
20              these efforts, I do not believe he is ready to reenter society.

21              Mr. Jackson committed an especially atrocious crime,
                demonstrating an exceptionally callous disregard for human
22              suffering.  According to the probations officer's report, after the
                initial confrontation the gang members left the school, armed
23              themselves, and returned to confront their rivals.  Nothing in the
                file indicates that the rival gang members had weapons or fired at
24              Mr. Jackson and his friends.  Rather, the record indicates that Mr.
                Jackson faced no imminent threat and had clear opportunities to
25              cease during the commission of the crime, but instead continued.
                These actions indicate deliberation and premeditation.

26

Moreover, Mr. Jackson's crime involved multiple victims and was committed in a manner that created a potential for serious injury to many innocent bystanders. Mr. Jackson and his crime partners attacked their rivals at a crowded high school event. During one of his psychological evaluations, he admitted firing directly at Mr. Jenkins, hitting him, and then firing several more shots into the crowd. By good fortune, the bullets hit only two victims. Mr. Jackson's crime could have resulted in many deaths. Yet the motive for the crime – a dispute between rival criminal gang members – is inexplicable or very trivial. After the crime, Mr. Jackson went to great lengths to avoid detection. He admitted during his 2002 parole hearing the he discarded the gun after the shooting. He then fled to Utah, returning only after being arrested for aggravated assault in that state. He evaded arrest for the gang shooting for over a year.

The facts of this offense are fare more aggravated than the minimum necessary to sustain a second degree murder conviction. Indeed, given that this was an active gang killing, Mr. Jackson could have been convicted of first degree murder with special circumstances and received the death penalty. Thus, the gravity of the crime alone justifies Mr. Jackson's further incarceration. However, additional concerns also indicate that he continues to pose an unreasonable danger to society.

Mr. Jackson refuses to accept adequate responsibility for his crime, indicating his continuing lack of remorse and failure to understand the nature and magnitude of the offense. Even though he already had pled guilty to second degree murder, during the interview with his probation officer prior to sentencing Mr. Jackson insisted that he was innocent. He admitted to being at the school when the shooting occurred, but denied having a gun. He reiterated these lies through several evaluations with psychologists and correctional counselors. Finally in 1990, 11 years after the shooting, Mr. Jackson admitted that he was one of the gunmen. Yet, he denied being involved in the initial confrontation with the rival gang at the high school. He said he was at his girlfriend's house when his friends returned from the school and told him what happened. He said they all decided to return to the campus armed.

During the 2002 parole hearing, Mr. Jackson maintained his claim that he was not involved in the initial confrontation at the school. However, he backtracked from his earlier statement that he met his fellow gang members after the initial confrontation and decided to return to the school armed. He said he happened to show up at the school armed for "no reason." He also attempted to minimize his responsibility by claiming that he only fired his weapon after others began shooting. He said "after the shooting started, I started shooting as well because I was young and at a location where everything was taking place."

8

In opposing Mr. Jackson's parole, the Los Angeles County District Attorney's Office expressed concern that Mr. Jackson's story indicates a lack of candor and insight.  I agree.  As the deputy district attorney stated during the 2002 parole hearing, Mr. Jackson is minimizing his involvement and attempting "to cast an aura of self-defense" on his role in the shooting.  This refusal to accept adequate responsibility indicates his continuing lack of remorse and failure to understand the nature and magnitude of the offense.

Furthermore, the shooting was not Mr. Jackson's first crime.  Rather, it culminated an escalating pattern of criminality and violence that Mr. Jackson began at a young age.  At 15, he was arrested for a robbery in which he and his fellow gang members accosted their victim in a high school locker room and stole his watch and ring.  He served time on probation, but failed to reform.  The following year he was arrested for possession of marijuana.  As an adult, he was arrested for robbery on three more occasions, possessing/manufacturing/selling deadly weapons, assault with a deadly weapon, and aggravated assault.  For one of these arrests, he served time in jail, but again refused to reform.  The last three arrests, which include an arrest and conviction for aggravated assault, occurred after the shooting.

Moreover, Mr. Jackson admits that he committed many more crimes than his record reveals.  According to one of his evaluations, he admitted that "the activities of his gang were becoming more seriously criminal, and they began arming themselves on a routine basis."  He said that they obtained these weapons by burglarizing cars and homes.  Also, he acknowledged that he was involved in many gang fights.

I am concerned that Mr. Jackson may not have severed his gang ties during his incarceration.  He claims he had disaffiliated himself from the gang by the time police arrested him for the shooting.  In 1985, however, Mr. Jackson's Life Prisoner Evaluation indicated that he had been identified with associates of his gang.  According to his 1990 psychological evaluation, housing staff reported seeing him associating with known gang members.  In 1992, he was placed in administrative segregation pending an investigation regarding violence and turmoil between rival gang factions.  Although sources identified Mr. Jackson as an influential gang leader, investigators found insufficient evidence to prove that he had acted in a negative manner.  A 1998 report states that insufficient evidence existed to identify Mr. Jackson as a member of any gang.  This does not equate to an affirmative finding that he is not a gang member, nor indicate when he terminated his gang membership.  I encourage the Board to request a thorough investigation to resolve this issue before Mr. Jackson's next parole hearing.

In finding Mr. Jackson suitable for parole, the Board found that he

1  has a stable social history.  I disagree and note that the panel
2  offered no factual support for this finding.  Mr. Jackson's pattern
   of violence, criminality, and gang involvement clearly contradict
   the Board's conclusion.  Also, the record indicates that Mr.
3  Jackson has a pattern of tumultuous relationships with others.  He
   fathered two children out-of-wedlock with two different girlfriends
4  prior to his incarceration.  He married a third girlfriend during his
   first year in prison, yet maintains no contact with her.  During his
5  parole hearing, he admitted that he does not know whether he
   remains married.

6

7  Finally, Mr. Jackson's parole plans are inadequate.  While he has a
   place to live upon his release, he does not have a formal job offer.
   Given the extent of his gang involvement and criminality, and the
8  fact that he plans to return to the same neighborhood, I believe it is
   critical for him to secure viable employment before his release.

9

10 Based on each of the factors articulated above, in addition to other
   evidence contained in the file, I believe Mr. Jackson continues to
   pose an unreasonable danger to society at this time.  I therefore
11 REVERSE the Board of Prison Terms' decision.

12 (Id. at 49-53.)

13       D.     State Habeas Corpus Proceedings

14              1.     Superior Court

15       Petitioner challenged the Governor's unfavorable decision in a petition for writ of

16 habeas corpus filed in the Los Angeles County Superior Court.  (Answer., Ex. 6. at 2.)  By order

17 dated March 15, 2005, that petition was denied.  (Id. at 5.)  The Superior Court explained its

18 reasoning as follows:

19              Having independently reviewed the record, giving deference to the
                broad discretion of the Governor in parole matters, the Court
20              concludes that the record contains "some evidence" to support the
                Governor's finding that Petitioner is unsuitable for parole.  (In re
21              Rosenkrantz (2002) 29 Cal.4th 616, 667; see Cal. Code Regs., tit.
                15, § 2402.)
22
                The Governor is constitutionally authorized to make "an
23              independent decision" as to parole suitability.  (Rosenkrantz,
                supra, at 670.)  Only a "modicum of evidence" is required.  (Id. at
24              677.)  The Governor concluded Petitioner is unsuitable for parole
                because the commitment offense was premeditated and deliberate
25              (Cal. Code Regs., tit. 15, §2402(c)(1)(B)), demonstrated an
                exceptionally callous disregard for human suffering (Cal. Code
26              Regs., tit. 15, §2402(c)(1)(D)), involved multiple victims (Cal.

Code Regs., tit. 15, §2402(c)(1)(A)) and that the motive was inexplicable or very trivial (Cal. Code Regs., tit. 5, §2402(c)(1)(E)).  The record reflects Petitioner and his crime partner, both of whom were members of the Crips gang, engaged in a verbal altercation with rival gang members at a school.  Thereafter, Petitioner and his crime partner, along with other gang members, left the area, retrieved guns and returned to the school.  Once there they confronted the rival gang members and began to shoot at them.  Two victims were struck, one died.  Petitioner then left the state and was arrested approximately a year and a half later.  Therefore, there is "some evidence" the crime was deliberate, that the motive was inexplicable or very trivial, and that multiple victims were attacked.  Moreover, the circumstances of the crime are more than the minimum necessary to sustain a conviction for second-degree murder.  (Rosenkrantz, supra, at 683.)  However, there is no evidence the crime demonstrated an "exceptionally callous disregard for human suffering.  (Cal. Code Regs., tit. 15, §2402(c)(1)(D)).

The Governor also found Petitioner unsuitable because of a prior unstable social history (Cal. Code Regs., tit 15, §2402(c)(3)) and a previous record of violence (Cal. Code Regs., tit. 15, §2402(c)(2)).  There is "some evidence" in the record to support each of those conclusions.

The Governor also found Petitioner unsuitable because he lacks remorse and insight and continues to minimize his involvement in the commitment offense.  (Cal. Code Regs., tit. 15, §2402(c)(2)).  The Governor relied upon records dating back to at least 1990.  He did not take into consideration the most recent psychological evaluation that concluded Petitioner had become "a benchmark" for developing a legitimate understanding of remorse and that he takes responsibility for his behavior.  Thus, the record contradicts the Governor's conclusion.

The Governor also found Petitioner unsuitable because his parole plans were inadequate in that he did not present (sic) a job offer.  (Cal. Code Regs., tit. 15, §2402(d)(8)).  The record reflects Petitioner had developed marketable skills since his incarceration.  That is all the statute requires.

Lastly, the Governor found Petitioner unsuitable because he suspected Petitioner might have been involved in gang activities during his incarceration.  He referred to a variety of alleged incidents but could not point to any confirmed gang associates.  In fact, the Board noted those allegations have been investigated and that the investigators concluded there was insufficient information to validate Petitioner's association.  In the face of such an investigation, there is no evidence to support the Governor's contention.

1       Nonetheless, for the reasons previously discussed, the petition is
        denied.

2   /////

3   Id. at 3-5.

4               2.      California Court of Appeal

5       On December 21, 2005, petitioner challenged the Superior Court's March 15,

6   2005 decision in a petition for a writ of habeas corpus filed in the California Court of Appeal for

7   the Second Appellate District.  (Answer, Ex. F. at 4.)  That petition was denied.  (Id. at 2.)

8               3.      California Supreme Court

9       Petitioner subsequently filed a petition for writ of habeas corpus in the California

10  Supreme Court, which was summarily denied on May 10, 2006.  (Answer, Ex. G. at 1-16.)  On

11  June 8, 2006, proceeding in pro per, petitioner filed the instant federal petition for a writ of

12  habeas corpus.

13  /////

14  III.   ANALYSIS

15      A.    Applicable Standard of Habeas Corpus Review

16      Federal habeas corpus relief is not available for any claim decided on the merits

17  in state court proceedings unless the state court's adjudication of the claim:

18          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
19          determined by the Supreme Court of the United States; or

20          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
21          State court proceeding.

22  28 U.S.C. § 2254(d).

23      Under section 2254(d)(1), a state court decision is "contrary to" clearly

24  established United States Supreme Court precedents if it applies a rule that contradicts the

25  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

26  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  The court looks to the last reasoned state court decision as the basis for the state court judgment.[1]  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

/////

B.       Petitioner's Claim[2]

1)       Description of Claim

Petitioner claims the Governor's decision reversing the Board's favorable suitability finding deprived him of his liberty without due process of law.  Specifically, petitioner claims that the Governor's reversal of the Board's favorable suitability finding was not supported by "some evidence."  Petition at 5.  Respondents argue that: 1) the deliberate and premeditated nature of the murder, 2) petitioner's prior unstable social history, 3) his prior acts

---

[1] The last reasoned state court opinion in this matter is the March 15, 2005 opinion of the Los Angeles County Superior Court, Case No. BH002544, attached to Respondent's Answer as Exhibit E.  (Hereinafter Opinion).

[2] In his petition petitioner lists two claims.  Petitioner's argument in the second claim is unclear, but nevertheless appears based upon the same due process argument raised in the first claim and analyzed in this report.

1    of violence, and 4) the fact that his crime was for a trivial motive, involving multiple victims,

2    constitute some evidence.  Answer at 8.

3            2)       Applicable Law

4            The Due Process Clause of the Fourteenth Amendment prohibits state action that

5    deprives a person of life, liberty, or property without due process of law.  A person alleging due

6    process violations must first demonstrate that he or she was deprived of a liberty or property

7    interest protected by the Due Process Clause and then show that the procedures attendant upon

8    the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v.

9    Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir.

10   2002).

11           A protected liberty interest may arise from either the Due Process Clause of the

12   United States Constitution or state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

13   The United States Constitution does not, of its own force, create a protected liberty interest in a

14   parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

15   However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

16   parole release will be granted' when or unless certain designated findings are made, and thereby

17   gives rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz

18   v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979)).  In this regard, it is clearly established that

19   California's parole scheme provides prisoners sentenced in California to a state prison term that

20   provides for the possibility of parole with "a constitutionally protected liberty interest in the

21   receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of

22   the Due Process Clause."  Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v.

23   Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910,

24   914 (9th Cir. 2003); McQuillion, 306 F.3d at 903; and Allen, 482 U.S. at 377-78 (quoting

25   Greenholtz, 442 U.S. at 12)).  Accordingly, this court must examine whether the deprivation of

26   petitioner's liberty interest in this case violated due process.

It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

When assessing whether a state parole board's suitability decision, or in the present case, the Governor's reversal of the Board's suitability decision, was supported by "some evidence," the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state."  Irons, 505 F.3d at 851.  Thus, this court must:

> look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" in [petitioner's] case constituted an unreasonable application of the "some evidence" principle articulated in Hill.

Id.

California law requires that the Board "determine whether a prisoner is presently too dangerous to be deemed suitable for parole based on the 'circumstances tending to show unsuitability' and the 'circumstances tending to show suitability' set forth in Cal.Code. Regs., tit. 15 § 2402(c)-(d)."  Irons, 505 F.3d at 662-63.

The Irons court described the regulations as follows:

> [T]he circumstances tending to show that a prisoner is unsuitable include: (1) the commitment offense, where the offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3)"a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal.Code. Regs., tit. 15 § 2402(c). Circumstances tending to show that a prisoner is suitable for parole include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; . . . (6) the prisoner lacks any significant history of violent crime; . . . (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities

15

1          indicate an enhanced ability to function within the law upon
          release." Cal.Code. Regs., tit. 15 § 2402(d).

2  /////

3  Id. at 663 n.4.

4          In California, the overriding concern in determining parole suitability is public

5  safety and the focus is on the inmate's current dangerousness.  In re Dannenberg, 34 Cal. 4th

6  1061, 1086 (Cal. 2005); In re Lawrence, 44 Cal. 4th 1181, 1205 (Cal. 2008).  The California

7  Supreme Court recently stated:

8          [T]he Penal Code and corresponding regulations establish that the
          fundamental consideration in parole decisions is public safety

9          [and] the core determination of "public safety" . . . involves an
          assessment of an inmate's *current* dangerousness. . . . [A] parole

10         release decision authorizes the Board (and the Governor) to
          identify and weigh only the factors relevant to predicting "whether

11         the inmate will be able to live in society without committing
          additional antisocial acts."  These factors are designed to guide an

12         assessment of the inmate's threat to society, *if released*, and hence
          could not logically relate to anything but the threat *currently* posed

13         by the inmate.

14  In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted).  Accordingly, in reviewing a

15  decision by the Board or the Governor to deny parole to an inmate, "the relevant inquiry is

16  whether some evidence supports the decision of the Board or the Governor that the inmate

17  constitutes a current threat to public safety, and not merely whether some evidence confirms the

18  existence of certain factual findings."  Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658

19  (Cal. 2002); In re Dannenberg, 34 Cal. 4th at 1071; In re Lee, 143 Cal. App. 4th 1400, 1408

20  (2006)).

21          "The 'some evidence' standard is minimally stringent," and a decision will be

22  upheld if there is any evidence in the record that could support the conclusion reached by the

23  fact-finder.  Powell, 33 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987));

24  Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence

25  underlying the [ ] decision must have some indicia of reliability."  Jancsek, 833 F.2d at 1390.

26  See also Perveler, 974 F.2d at 1134.  Determining whether the "some evidence" standard is

16

satisfied does not require examination of the entire record, independent assessment of the

credibility of witnesses, or the weighing of evidence.  Toussaint, 801 F.2d at 1105.  The question

is whether there is any reliable evidence in the record that could support the conclusion reached.

Id.

C.  Discussion

As noted above, the Governor relied on the following six findings to deny

petitioner parole: (a) that petitioner "committed an especially atrocious crime, demonstrating an

exceptionally callous disregard for human suffering," which " involved multiple victims and was

committed in a manner that created a potential for serious injury to many innocent bystanders,"

that "the motive for the crime – a dispute between rival criminal gang members – is inexplicable

or very trivial," and that the facts of the crime "are far more aggravated than the minimum

necessary to sustain a second degree murder conviction," (b) that petitioner "refuses to accept

adequate responsibility for his crime," which "indicates his continuing lack of remorse and

failure to understand the nature and magnitude of the offense," (c) that petitioner demonstrated

an "escalating pattern of criminality and violence that [petitioner] began at a young age," (d) that

petitioner "may not have severed his gang ties," (e) that petitioner "has a pattern of tumultuous

relationships with others," and (f) that petitioner's "parole plans are inadequate" because "he

does not have a formal job offer."  Of these six findings, the superior court found that only three

of the stated findings were supported by the record.  The undersigned will review each of these

six findings.

a.  Factors Relating to the Commitment Offense

As noted above, the Governor found that petitioner's commitment offense was

"an especially atrocious crime, demonstrating an exceptionally callous disregard for human

suffering," that " involved multiple victims and was committed in a manner that created a

potential for serious injury to many innocent bystanders," that "the motive for the crime – a

dispute between rival criminal gang members – is inexplicable or very trivial," and that the facts

of the crime "are far more aggravated than the minimum necessary to sustain a second degree

murder conviction."  Answer, Ex. C. at 4.

The superior court found that there was "some evidence" that the crime was

deliberate, the motive inexplicable or very trivial, that multiple victims were attacked, and that

the circumstances of the crime were more than the minimum necessary to sustain a conviction

for second-degree murder.  Opinion at 4.  However, that court also found that there was no

evidence the crime demonstrated an "exceptionally callous disregard for human suffering."  Id.

The terms used by the Governor all relate to the facts of petitioner's "commitment

offense," the circumstances of which are one factor that may indicate unsuitability.  Cal.Code.

Regs., tit. 15 § 2402(c)(1).  These circumstances have been defined by the California courts as

follows:

> A prisoner's commitment offense may constitute a circumstance
> tending to show that a prisoner is presently too dangerous to be
> found suitable for parole, but the denial of parole may be
> predicated on a prisoner's commitment offense only where the
> Board can "point to factors beyond the minimum elements of the
> crime for which the inmate was committed" that demonstrate the
> inmate will, at the time of the suitability hearing, present a danger
> to society if released.  [In re] Dannenberg, 34 Cal.4th [1061] at
> 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005).  Factors
> beyond the minimum elements of the crime include, inter alia, that
> "[t]he offense was carried out in a dispassionate and calculated
> manner," that "[t]he offense was carried out in a manner which
> demonstrates an exceptionally callous disregard for human
> suffering," and that "[t]he motive for the crime is inexplicable or
> very trivial in relation to the offense." Cal.Code. Regs., tit. 15
> § 2402(c)(1)(B), (D)-(E)."

/////

Irons at 663; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole,

the "factors beyond the minimum elements of the crime" "must  be predicated on "some

evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond the

minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial

provocation, and thus suggested he remains a danger to public safety.")

In California, "[s]econd degree murder is defined as the unlawful killing of a

18

human being with malice aforethought, but without the additional elements--i.e., willfulness, premeditation, and deliberation-that would support a conviction of first degree murder." People v. Nieto Benitez, 4 Cal.4th 91, 102 (1992).  "Malice, for the purpose of defining murder, may be express or implied.  (§ 188.)  It is express 'when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' (§ 188; People v. Mattison (1971) 4 Cal.3d 177, 182, 93 Cal.Rptr. 185, 481 P.2d 193.)  Implied malice is present "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; People v. Mattison, supra.)."  Id. at 102-103.

Under California law,

> "all second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.  [Citation.]  As noted, however, parole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable."  (In re Smith (2003) 114 Cal.App.4th 343, 366.)
> . . . .
>
> Therefore, to demonstrate 'an exceptionally callous disregard for human suffering' [within the meaning of applicable provisions of the California parole statutes], the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of second degree murder.

In re Scott, 119 Cal.App.4th 871, 891 (2004).  Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering."  In re Smith, 114 Cal.App.4th at 367.

Similarly, in In re Scott the court noted that a finding of "triviality" sufficient to justify the denial of parole must also relate to present dangerousness:

> The offense committed by most prisoners serving life terms is, of course, murder. Given the high value our society places upon life, there is no motive for unlawfully taking the life of another human being that could not reasonably be deemed "trivial." The Legislature has foreclosed that approach, however, by declaring

that murderers with life sentences must "normally" be given release dates when they approach their minimum eligible parole dates. (Pen.Code, § 3041, subd. (a).) The governing statute also states that the Board shall set a release date "unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).) This language means a "more lengthy period of incarceration" is called for where the gravity of the offense or offenses of the prisoner in question is more indicative of a danger to the public if the prisoner is released than would ordinarily be the case. The reference in Board regulations to motives that are "very trivial in relationship to the offense" therefore requires comparisons; to fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily presented.

/////

In re Scott, at 893.

In this case, a member of a rival gang faction started a fight with a member of petitioner's gang. That fight escalated into multiple persons, including petitioner, firing weapons resulting in injury to two members of the rival gang faction. The deceased victim was shot by two different caliber bullets, one of which was the same caliber bullet as those fired by petitioner's gun. It does not appear from the record that the caliber of weapon of the third shooter was ever determined nor is there evidence as to what caliber of weapon injured the second victim. Finally, it was never conclusively determined whose gun fired the bullets that struck the deceased victim. Petitioner pled guilty to one count of second degree murder.

Petitioner's actions were not "more aggravated or violent" than any other actions that result in a second degree murder conviction. The deceased victim was not executed in his sleep, tormented, terrorized or injured prior to being shot. Petitioner did not plan or rehearse the murder, or gratuitously increase or unnecessarily prolong the victim's pain and suffering. Additionally, there is no evidence that petitioner was responsible for injury to anyone other than the deceased victim. Petitioner's actions, over 20 years prior to his hearing before the Board,

20

1  while certainly serious and deserving of his sentence, were not "especially heinous, atrocious or

2  cruel" in comparison to others convicted of the same crime.

3        The facts of petitioner's commitment offense do not support a finding that he

4  committed his crime in a "more aggravated or violent manner" than other criminal have

5  committed second degree murder.  Review of the record reveals no evidence that petitioner's

6  commitment offense was carried out with the type of gratuitous violence, torture or disregard for

7  the victim that would permit it to be defined as "especially callous" as that term has been defined

8  by the California courts.  Absent circumstances beyond the minimum elements of his crime,

9  petitioner cannot be denied parole based solely on the minimum elements of his crime.  See Irons

10  at 663; see also In re Weider, 145 Cal.App.4th at 588 (to support denial of parole, the "factors

11  beyond the minimum elements of the crime" must  be predicated on "some evidence that the

12  particular circumstances of [the prisoner's] crime-circumstances beyond the minimum elements

13  of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus

14  suggested he remains a danger to public safety.")

15        Even if petitioner's crime had been particularly callous at the time it was

16  committed, the role of the Governor was to conduct an individualized suitability determination

17  for petitioner and to focus upon the public safety risk currently posed by petitioner.  In re

18  Lawrence, 44 Cal. 4th at 1205-06, 1217, 1221.  The relevant inquiry "is not merely whether an

19  inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified

20  facts are probative to the central issue of current dangerousness when considered in light of the

21  full record before the Board or the Governor."  Id. at 1221; In re Dannenberg, 34 Cal. 4th at

22  1070-71.

23        The circumstances of petitioner's commitment offense, when considered in light

24  of the extensive evidence of his in-prison rehabilitation and exemplary behavior over the 20

25  years between his incarceration and his suitability hearing, are not predictive of his current

26  dangerousness.  In re Lawrence, 44 Cal. 4th  at 1205-06, 1217, 1221; In re Elkins, 144 Cal. App.

4th 475, 498-99 (2006) (internal citations omitted) ("[T]he commitment offense . . . is an unsuitability factor that is immutable and whose predictive value 'may be very questionable after a long period of time.' . . . Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation.").

It therefore appears that the superior court's conclusion that "some evidence" supported the Governor's findings concerning factors of the commitment offense is not supported by evidence in the record.

/////

b.   <u>Remorse And Responsibility</u>

In supporting his reversal, the Governor asserted that petitioner refused to "accept adequate responsibility for his crime," arguing that this refusal indicated petitioner's "continuing lack of remorse and failure to understand the nature and magnitude of the offense."  Answer, Ex. C. at 4.  The Superior Court rejected this contention, finding that the Governor "did not take into consideration the most recent psychological evaluation that concluded petitioner had become 'a benchmark' for developing a legitimate understanding of remorse and that he takes responsibility for his behavior.'"  Opinion at 4.

In petitioner's Final Category "T" Report it was noted that "as well as this inmate's excellent insight and the reality of many of the negative influences in his life, he has consistently and remorsefully acknowledged his responsibility for his behavior . . . his participation, insight, and ability to understand many of the major influences in his life were excellent."  Petition at 78.  That report goes on to state, that "[p]erhaps more than most inmates, Mr. Jackson seemed to personify an appreciation of the negative, tragic effects of violence and a full appreciation of how to refrain from similar acts in the future."  <u>Id</u>.  Finally, the report states that:

Mr. Jackson, as documented in treatment chronos and observed in

1  the course of our individual therapy, is painfully aware of the grief
   that he caused to the victim's family and states "I've always felt
2  sorrow for my victim." He admitted that he learned some new
   things about remorse in the group, and stated of his victim: ". . . we
3  were friends, knew each other . . . respected each other. I was
   panicking that night . . . I wasn't aware that he was the person I
4  had shot until two days later." Mr. Jackson freely admitted that he
   at first attempted to rationalize his act of murder as "me or him"
5  but later came to appreciate: ". . . what his family went through
   even though I didn't get it at first. It took me awhile (to feel
6  remorse) . . . the more I could relate to others suffering through my
   own, the more compassionate I became." Mr. Jackson admitted
7  being in denial about his feelings until about eight years ago, at
   which point, he describes going through a rather intense period of
8  sadness and mourning for his victim.

9  Id. at 79.

10      The superior court's conclusion that the record does not support the Governor's

11 findings regarding remorse and responsibility is supported by the record.

12              c.      Pattern of Criminality And Violence

13      The Governor next supported his reversal by claiming that petitioner had

14 demonstrated an "escalating pattern of criminality and violence that [petitioner] began at a young

15 age." The Los Angeles County Superior Court found that there was "some evidence" to support

16 this conclusion. Opinion at 4.

17      A previous record of violence is one factor that can indicate unsuitability. Cal.

18 Code Regs., tit. 15 §2402 (c)(2). Under California Law, a previous record of violence is found

19 where "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a

20 victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." Id.

21      According to the probation report cited by the Governor, petitioner was found

22 guilty of robbery at age 15, when he stole a schoolmate's watch and ring. Answer, Ex. B. at 5.

23 There is no mention of any of injury suffered by the victim.

24      Additionally, petitioner admits to getting into a fight while enrolled in the Job

25 Corps, which apparently resulted in an assault charge. Answer, Ex. D. at 33. Again, there is no

26 evidence regarding the extent of injury to the victim. Aside from these two incidents, there are

23

no other confirmed instances of crime or violence, other than the commitment offense.  The

probation report cited by the Governor stated that petitioner had a "limited criminal record."

Answer, Ex. B. at 10.  The Board found that petitioner's "convictions are maybe just one or

two."  Answer, Ex. D. At 15.

The Governor supported his claim by referencing times petitioner had been

arrested.  The Board reviewed the facts of these arrests in detail at the suitability hearing.  Id. at

16-17.  None of these arrests involved accusation of violence and all of them ended with those

matters either being "closed,"  "dismissed in the interest of justice," or "dropped" without ever

proceeding to trial or conviction.  Id.

During the 20 years between petitioner's incarceration and his suitability hearing,

he had not been involved in any crime or violence and had a classification score of zero after

1990.  Answer, Ex. D. at 25.

The superior court's conclusion that "some evidence" supported the Governor's

finding that petitioner had an "escalating pattern of criminality and violence" is not supported by

evidence in the record.

d.   Gang Ties

The Governor next supported his reversal by stating his concern that petitioner

had not severed his gang ties during his incarceration.  The Los Angeles County Superior Court

rejected this claim.  The court noted that:

> [The Governor] referred to a variety of alleged incidents but could
> not point to any confirmed gang associations.  In fact, the Board
> noted those allegations have been investigated and that the
> investigators concluded there was insufficient information to
> validate petitioner's association.  In the face of such an
> investigation, there is no evidence to support the Governor's
> contention.

Opinion at 5.  The superior court's conclusion is supported by the record.[3]

---

[3] Not only did the investigation into petitioner's gang affiliation result in insufficient
evidence of affiliation, but petitioner claimed that he himself requested the investigation at the

e.      Unstable Social History

The next factor used by the Governor to justify the reversal of the Board's finding of suitability for parole was petitioner's prior unstable social history.  The Governor stated that petitioner had "a pattern of tumultuous relationships with others" evidenced by his fathering two children out-of-wedlock with two different women, and by the fact that petitioner married during his first year of incarceration but did not know if he remained married.  Petition at 53.  The Superior Court found that there was "some evidence" to support this conclusion.  Opinion at 4.

Under California law, one factor tending to show unsuitability for parole is the presence of an unstable social history.  Cal. Code Regs., tit. 15 §2402 (c)(3).  An unstable social history is defined as a "history of unstable or tumultuous relationships with others."  Id.

During petitioner's suitability hearing he stated that he was in contact with his two children, as well as his siblings.  Answer, Ex. D. at 18, 21.  Petitioner introduced letters of support from his aunt, cousin, mother, and each of his three sisters, all of which contained positive comments about him.  Id. at 20-24.  Additionally, petitioner's April 6, 2001 Psychological Report indicated that he had weekly contact with his siblings and his mother. Petition at 72.  Finally, during the entire time petitioner had been incarcerated there was no evidence of unstable or tumultuous relationships with other prisoners or staff members.

It is not evident how petitioner's fathering two children out-of-wedlock with two different women, but maintaining relationships with each those children, is evidence of "tumultuous relationships with others."  Additionally petitioner's failure to remain in contact with his wife, whom he married shortly after he became incarcerated, does not demonstrate a "pattern" and may or not be the result of a "tumultuous relationship."  Finally, there is no evidence that petitioner's fathering children out-of-wedlock and/or not remaining in contact with his wife is indicative of some degree of current dangerousness.  In re Lawrence, 44 Cal. 4th at

urging of the Board at a prior suitability hearing.  Answer, Ex. D. at 34-35.

1205 ("the core determination of 'public safety' under the statute and corresponding regulations

involves an assessment of an inmate's <u>current</u> dangerousness.")

The superior court's conclusion that "some evidence" supported the Governor's

finding that petitioner had a "prior unstable social history" is not supported by evidence in the

record.

/////

f.      <u>Suitability of Parole Plans</u>

The final factor discussed by the Governor to support his reversal was that

petitioner's parole plans were inadequate.  Petition at 53.  The Governor stated that "[w]hile

[petitioner] has a place to live upon his release, he does not have a formal job offer."  <u>Id.</u>  The

Los Angeles County Superior Court rejected the Governor's claim, finding that "[t]he record

reflects petitioner has developed marketable skills since his incarceration.  That is all the statute

requires."  Answer, Ex. E. at 5.

Under California law, one factor tending to show suitability for parole is that the

a petitioner "has made realistic plans for release or has developed marketable skills that can be

put to use upon release."  Cal. Code. Regs., tit. 15 § 2402(d)(8).  There is no requirement that

petitioner obtain a formal job offer.

During petitioner's confinement, he earned an AA, a BA, participated in

vocational training in shoe repair and automotive repair, and progressed from vocational training

to paid employment as an optical lens technician.  Answer, Ex. D. at 24-16.  Additionally,

petitioner had an offer to receive employment services via the Offender Employment

Continuum, and had an offer of residence with his aunt.  <u>Id.</u> at 21, 24.  Upon his release,

petitioner planned to "be an optician or mechanic or use [his] degree."  <u>Id.</u> at 24.

Petitioner had developed marketable skills and had a realistic plan upon his

release.  The superior court's conclusion as to this factor is supported by the record.

/////

26

IV.    <u>CONCLUSION</u>

In evaluating whether the Governor's reversal of the Board's suitability decision was supported by "some evidence," the court's analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." <u>Irons</u>, 505 F.3d at 851.  Thus it "must look to California law to determine the findings that are necessary to deem [petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence'" was an unreasonable application of the "some evidence" standard.  <u>Id</u>.

Here, the Superior Court found that only three of the Governor's six findings were supported by the record.  Those three were factors relating to the commitment offense, a pattern of criminality and violence, and an unstable social history.  Under California law, however, the findings necessary to deem a prisoner unsuitable for parole must be based on "some evidence" that petitioner is a "current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." <u>In re Lawrence</u>, 44 Cal.4th 1181, 1212 (Cal. 2008).   After careful review of this record, there appears no evidence to support the Governor's findings or to support a finding that petitioner posed a current threat to public safety.

Petitioner had received multiple positive psychological evaluation, including a 1997 evaluation that concluded:

> Mr. Jackson is seen as exceptional in many aspects if he is compared to all inmates in any prison setting.  In some ways, he is a self made man and currently has set a path for himself that now can only be interpreted as positive and goal oriented.  He was lost in the shuffle of being raised with a brood of nine other siblings and clearly lacked the guidance and goal direction that should have been his birth right but was ultimately denied him.  At this time, the examiner can say that Mr. Jackson is an emotionally healthy person, who is both strong and sensible in his convictions and sensitivity (sic) to other people.  Since Mr. Jackson has no history of alcohol or drug abuse and has come to grips with his civil responsibilities, a parole recommendation can be made with confidence.

Petition at 64-65.

As noted above, during his incarceration petitioner received vocational training and a college education. Petitioner also participated in numerous prison sponsored therapy and self-help programs, including Amer-I-Can, Breaking Barriers, the complete battery of Cat T programs, which included years of therapy for rational thinking, MVP program, and Anger Management. Petition at 109-10. Petitioner had regular contact with his family and a place to reside upon release. Perhaps most importantly, in his 20 years of incarceration, during which petitioner interacted with countless other prisoners, correctional staff, therapists, educators, and others, petitioner was never involved in an incident of violence and had a classification score of zero after 1990.

The adverse findings by the Governor, affirmed by the superior court, are not supported by evidence in the record. Petitioner's crime involved no more than the minimum elements necessary for a conviction of one count of second degree murder. His criminal record was limited and lacked evidence of violent injury prior to the commitment offense. At the time of his suitability hearing petitioner had a history of stable social relationships with many members of his family including his children, his mother and his sisters. Further, the Governor did not indicate how his findings evidenced that petitioner was currently a threat to public safety as required under California law. In re Lawrence, 44 Cal. 4th at 1205.

Because there was no evidence in the record to support the Governor's findings, regarding the factors prescribed by California law, the superior court's finding of some evidence was unreasonable and a violation of petitioner's right to due process.

Therefore, in accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted;

2. Respondents be directed to release petitioner from custody within 10 days of any order adopting these findings and recommendations; and

1           3.  Respondents be directed to file, within 10 days of petitioner's release, a notice

2    with the court confirming the date on which petitioner was released.

3           These findings and recommendations are submitted to the United States District

4    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

5    after being served with these findings and recommendations, any party may file written

6    objections with the court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

8    failure to file objections within the specified time may waive the right to appeal the District

9    Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

10   DATED: December 12, 2008

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE